**Stephanie Anne BOSWORTH, a minor by her parent and natural guardian, Stephen E. Bosworth, and Stephen E. Bosworth in his own right, Plaintiffs,**

v.

**L. G. PLUMMER, an individual, and Latrobe Area Hospital, Inc., a corporation, jointly and severally, Defendants.**

Civ. A. No. 77–1392.

United States District Court,
W. D. Pennsylvania.

April 6, 1981.

Howard F. Messer, Pittsburgh, Pa., Richard D. Lindsay, Preiser & Wilson, Charleston, W. Va., for plaintiffs.

Robert S. Grigsby, Thomas D. Thomson, Jerome Kiger, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, District Judge.

Stephen E. Bosworth brought this diversity action in his own right and as the parent and natural guardian of Stephanie Anne Bosworth. He asserts claims for damages against defendants, Dr. Lloyd Gordon Plummer and Latrobe Area Hospital, Inc., as a result of their alleged malpractice in connection with the birth of Stephanie Anne Bosworth on April 21, 1971. Stephanie is afflicted with a condition commonly referred to as "cerebral palsy." The plaintiffs allege that the defendants' malpractice during the labor and delivery process was the proximate cause of this affliction.

Mr. Bosworth filed this action on December 8, 1977, six years and seven months after Stephanie's birth. The parties have conducted extensive discovery and have submitted their pretrial statements. The defendants now move for summary judgment on the ground that the plaintiffs' claims are barred by the statute of limitations. Latrobe Area Hospital, Inc. ("Latrobe Hospital") also moves for summary judgment on the ground that the plaintiffs lack essential expert testimony linking Stephanie's injury to the hospital's conduct.

A federal court will grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party. *Goclowski v. Penn Central Transportation Company*, 571 F.2d 747, 751 (3d Cir. 1977). The movant has the burden of establishing that no genuine issue of fact exists. *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 848 (3d Cir. 1974). With these principles in mind, we now turn to an examination of the merits of the defendants' motions.

### Facts

On April 20, 1971, Joanne Bosworth, Stephanie's mother, began to notice complications with her pregnancy. Pursuant to instructions given by Doctor Lloyd Plummer, she entered Latrobe Hospital at eight that evening. Dr. Plummer delivered Stephanie the following morning. The baby did not begin to breathe until four minutes after

birth. During that four minute period, Dr. Plummer aspirated the baby's nose, mouth and endotracheal tree. The baby subsequently was placed in an incubator and was provided with mechanical assistance in respirating. Later that same day, Stephanie was transferred to Children's Hospital and then to Magee Women's Hospital in Pittsburgh for intensive care for her breathing problems.

A few hours after Stephanie's birth, Nurse Sarnesso and Dr. Sarver informed Stephanie's parents that the baby had stopped breathing for four minutes, that respiratory complications had resulted from this lapse, and that the baby might be transferred to Children's Hospital. Later that day, a resident at Magee Women's Hospital told Mr. Bosworth that Stephanie had been placed on a respirator. After extensive treatment, Stephanie gained the ability to breathe without assistance and eventually was released from the hospital.

In September or October of 1971, Dr. Chorazy of Children's Hospital informed Stephanie's parents that she was suffering from cerebral palsy. Stephanie began to have mild seizures when she was approximately a year old. Her parents understood the seizures to be a consequence of the cerebral palsy. Soon after the seizures began, Mr. Bosworth, who worked as a sales representative in the medical supply industry, briefly discussed his daughter's condition with Dr. McKenzie, who was the Chief of the Anesthesiology Department at Magee Women's Hospital. Dr. McKenzie told Mr. Bosworth that Stephanie's cerebral palsy could have resulted from a multitude of occurrences. Mr. Bosworth recalls two of the possible explanations: prolonged labor and a blood clot in the umbilical cord.

The Bosworths subsequently moved from Latrobe to Wheeling, West Virginia. In December, 1975, Mrs. Bosworth consulted Dr. Ashme Abdel-Messih, a gynecologist in the Wheeling area, because she was interested in having another child. After obtaining and reviewing Dr. Plummer's records, Dr. Abdel-Messih informed Mrs. Bosworth that Stephanie's difficulties were not hereditary and were not the result of any physiological defect, but rather, that they arose solely from the events surrounding the labor and the delivery.

Based upon Dr. Abdel-Messih's opinion, the Bosworths discussed with an attorney in West Virginia the possibility of initiating a lawsuit against Dr. Plummer and Latrobe Hospital. That attorney referred the Bosworths to an attorney in Pittsburgh, who filed the present action on December 8, 1977. Prior to Mrs. Bosworth's visit with Dr. Abdel-Messih, the Bosworths had not conducted any investigation nor made any inquiry to discover the root of Stephanie's difficulties. Mrs. Bosworth is not a party to this action.

### Analysis

The defendants contend that the statute of limitations expired on the plaintiffs' claims long before Mr. Bosworth filed this lawsuit. We must apply the Pennsylvania statute of limitations to this diversity case because the substantive law of Pennsylvania supplies the plaintiffs with their causes of action. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 108–10, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The applicable statute provides that "[e]very suit hereafter brought to recover damages for injury wrongfully done to the person . . . must be brought within two years from the time when the injury was done and not afterwards." Act of June 24, 1895, P.L. 236, § 2, 12 Pa.Stat.Ann. § 34 (1953) (current version at 42 Pa.Cons.Stat.Ann. § 5524 (Purdon's Pamphlet 1980)). This statute of limitations embodies the following three policies: (1) rights should be enforced without unreasonable delay; (2) after a certain period of time a defendant should have repose and should be spared from defending against a stale claim; and (3) it is wasteful to use judicial resources to decide stale claims on stale evidence. *Anthony v. Koppers Company, Inc.*, —— Pa.Super. ——, ——, 425 A.2d 428, 441 (1980).

"In Pennsylvania, the statute of limitations begins to run when a cause of action accrues." *United States Fidelity & Guar-*

*anty Company v. DiMassa*, 496 F.Supp. 71, 73 (E.D.Pa.1980). Courts traditionally have held that a cause of action accrues when the tortious act is committed, even though the plaintiff does not know that damage has occurred or even though damage has not yet occurred. *See Bernath v. LeFever*, 325 Pa. 43, 46, 189 A. 342, 343 (1937); *Noonan v. Pardee*, 200 Pa. 474, 484, 50 A. 255, 257 (1901). *Accord, Restatement (Second) of Torts* § 899, comment e (1979).

Recognizing that the traditional rule often produced harsh results in the area of medical malpractice litigation, the Pennsylvania Supreme Court modified that rule in *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959). The claim in *Ayers* arose from the defendant's failure to remove a gauze sponge from the body of the plaintiff upon completion of surgery to repair an ulcer. Although the plaintiff had continued to suffer discomfort following the operation, the cause of that discomfort was not discovered until nine years later. After the offending sponge was removed, the plaintiff initiated a malpractice action against the original surgeon. The trial court entered judgment for the defendant on the ground that the action was time-barred.

On appeal, the Supreme Court reversed. Acknowledging that the Act of June 24, 1895 requires that a tort action " 'be brought within two years from the time *when the injury was done* '," the court held that "[t]he injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." 397 Pa. at 290, 154 A.2d at 792 (emphasis in original). The court determined that a doctor should not escape liability for injuring a patient simply because his negligence was concealed and difficult to discover. *Id.* at 294, 154 A.2d at 794.

 The modification of the law that was implemented in *Ayers* has come to be known by courts and commentators as the "discovery rule." Succinctly stated, the discovery rule provides that the statute of limitations will not begin to run on a claim until the time when the plaintiff discovers or reasonably should discover the cause of

the harm or injury. *Acker v. Palena*, 260 Pa.Super. 214, 219, 393 A.2d 1230, 1232 (1978). The rule reflects the value judgment that the statute of limitations should not "preclude recovery for an injury that not even a diligent party may reasonably be expected to discover." *Anthony v. Koppers Company, Inc.*, —— Pa.Super. ——, ——, 425 A.2d 428, 432 (1980). Thus, "[u]nder the law of Pennsylvania, it is the duty of one asserting a cause of action against another to use all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based and to institute the suit within the prescribed statutory period.... [I]f the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitation does not begin to run until discovery of the injury is reasonably possible." *Schaffer v. Larzelere*, 410 Pa. 402, 405–06, 189 A.2d 267, 269–70 (1963) (citations omitted).

Although the discovery rule is easy to state, the application of the rule to a particular set of facts can present difficult issues. In the present case, the difficulty arises from uncertainty as to the level of understanding that the plaintiff must possess about the cause of the injury in order to trigger the running of the statute of limitations. According to the discovery rule, the limitations period started to run at the time when Mr. Bosworth reasonably should have discovered the cause of Stephanie's injury. This case involves several layers of causation, however. On the day of Stephanie's birth, the Bosworths learned that Stephanie's respiratory problems were the result of the baby's failure to breathe during the first four minutes following delivery. Seven months after Stephanie's birth, the Bosworths learned that their child had cerebral palsy. Several months later, Dr. McKenzie discussed some of the causes of cerebral palsy with Mr. Bosworth. Finally, almost five years after Stephanie's birth, Dr. Abdel-Messih told Mrs. Bosworth that Stephanie's problems had their origin in the events surrounding the labor and the delivery

rather than in heredity or in a physiological defect. The Bosworths inferred from Dr. Abdel-Messih's remarks that Dr. Plummer or an employee of Latrobe Hospital had committed malpractice during the labor or the delivery.

The proper disposition of the defendants' motions for summary judgment depends on which layer of causation triggered the running of the statute of limitations. If the limitations period did not start to run until Mr. Bosworth had reason to believe that he and his daughter had causes of action against a particular person, then the present action is not time-barred because Mr. Bosworth initiated suit within two years of the date on which Dr. Abdel-Messih expressed the opinion that the injury resulted from the events of the labor and the delivery. On the other hand, if the limitations period started to run when Mr. Bosworth had reason to know the nature of the injury and the immediate cause of that injury, then the present case is time-barred because Mr. Bosworth knew within a year of Stephanie's birth that she had contracted cerebral palsy as a result of a failure to breathe normally during the first four minutes following delivery.

The Superior Court of Pennsylvania, in *Anthony v. Koppers Company, Inc.,* —— Pa.Super. ——, 425 A.2d 428 (1980), recently attempted to identify the level of understanding about the cause of an injury that is necessary to trigger the running of the statute of limitations. This effort occurred in an action that the administrators of the estates of certain deceased steelworkers had filed to assert survival and wrongful death claims against three companies that had manufactured, sold or installed coke ovens that were located in a Bethlehem Steel Corporation plant. The plaintiffs alleged in their complaint that exposure to emissions from these coke ovens had caused their decedents to contract cancer of the lungs, which ultimately resulted in death. All of the decedents had died more than two years before the administrators of their estates initiated the lawsuit. The applicable statutes of limitations were two years for survival actions and one year for wrongful death actions. The defendants moved for summary judgment on the ground that the statutes of limitations had run. After denying the motions, the trial court certified the issue for interlocutory appeal.

On appeal, the Superior Court affirmed the denial of the motions. In its opinion, the Superior Court first held that the law of Pennsylvania permits the application of the discovery rule in a "creeping disease" case, that is, "a case in which the plaintiff has contracted a disease from a continuous exposure to a hazardous substance." *Id.* at ——, 425 A.2d at 434. Justice and public policy support the application of the rule in such a case because "it is difficult to determine at what point the exposure caused the disease, and after the disease has been contracted, to discover its cause." *Id.*

The court next turned to the task of defining the informational threshold that triggers the running of the statute of limitations. Adopting the language contained in an opinion that a trial court had issued in an asbestosis case, the Superior Court noted that

"*Ayers'* progeny have struggled primarily with the question of the reasonableness of plaintiff's conduct in attaining the appropriate level of cognitive knowledge which ultimately prompts a timely lawsuit. With the question of 'reasonableness' as a constant qualification running through the decisional law, the principle emerges that three independent phases of knowledge must be known or knowable to plaintiff before the limitations period commences: (1) knowledge of the *injury*; (2) knowledge of the *operative* cause of the injury; and (3) knowledge of the *causative relationship* between the injury and the operative conduct. In the typical personal injury case, knowledge of the foregoing elements is gained contemporaneously with the occurrence of the liability creating events and little difficulty is presented in applying the commencement of the statute of limitations period. When time and space intervene between the several levels of knowledge, however,

courts have struggled with the application of the articulated legal standard to the facts involved. An analysis of the case law compels the conclusion that when a plaintiff knows or has reason to know of his injury, its operative cause, and the causative relationship to independent occurrences, he possesses as a matter of law, the necessary information to herald a possible tort and hence commence the running of the statutory period."

*Id.* at ——, 425 A.2d at 436 (quoting *Volpe v. Johns-Manville Corp.,* No. 2052 Philadelphia Court of Common Pleas, January Term 1977, slip op. at 4–5 (May 2, 1980) (emphasis in original)). Applying this three step analysis to the facts of the case before it, the Superior Court determined that

> even though here it may be said that in the sense of awareness of physical harm the injuries must have manifested themselves at least by the times of the decedents' deaths, in the sense of awareness of the operative cause of the harm and of the causative relationship between the harm—cancer—and the conduct—emissions from the coke ovens—the injuries could have manifested themselves long after the decedents' deaths, when the decedents' representatives discovered the cause of their deaths.

—— Pa.Super. at ——, 425 A.2d at 437. Therefore, the court concluded that the statute of limitations may not have started to run on the survival and wrongful death claims until a considerable time after the employees' deaths.

■ We attach significance to the fact that the Superior Court defined the relevant conduct as "emissions from the coke ovens" rather than as "negligence in the manufacture or the installation of the coke ovens." If the latter had been selected as the controlling definition, the statute of limitations would not have begun to run until the injured party or his representative knew or should have known that he had a cause of action arising from his injury. The

Superior Court expressly rejected this proposition, however. *Id.* at ——, 425 A.2d at 436. Instead, the Superior Court determined that the limitations period began to run when the plaintiff learned the "causative relationship between the injury and the operative conduct." Applying this approach to the Bosworths' claims, we find that the "injury" was the cerebral palsy and the "operative conduct" was the oxygen deprivation. Therefore, we hold that the two year limitations period began to run when Mr. Bosworth learned that Stephanie had cerebral palsy, that this affliction resulted from oxygen deprivation immediately following delivery, and that a variety of occurrences, including prolonged labor and a blood clot in the umbilical cord, could have caused the oxygen deprivation. Upon acquiring the last of this information approximately one year after Stephanie's birth, Mr. Bosworth had sufficient knowledge about the circumstances surrounding his daughter's injury to initiate an investigation to determine whether or not anyone was legally responsible for that injury.[1] Pennsylvania courts expect potential plaintiffs to exercise reasonable diligence in determining whether or not they have legal remedies for injuries that they have sustained. *See Schaffer v. Larzelere,* 410 Pa. 402, 405, 189 A.2d 267, 269 (1963).

Our interpretation of the *Anthony* case and our application of its analysis to the Bosworth claims find support in the decision of the Superior Court of Pennsylvania in *Wallace v. Horvath,* —— Pa.Super. ——, 423 A.2d 1047 (1980). The *Wallace* case had its genesis in the treatment that Doctor Ronald Horvath and Chestnut Hill Hospital rendered to Cheryl Wallace after she broke her arm.

On January 1, 1974, at Chestnut Hill Hospital in Pennsylvania, Dr. Horvath surgically implanted a metal plate in Ms. Wallace's arm and placed the arm in a cast. Ms.

---

1. Mr. Bosworth was in a particularly good position to launch such an investigation. In his business as a sales representative of a medical supply company, he came into contact with doctors on a daily basis. As a result of this contact, he should have known that doctors occasionally do make mistakes; he certainly would not have been intimidated by doctors.

Wallace twice returned to Dr. Horvath because she was experiencing continued pain and because the skin on her arm was blistering and peeling. Both times the doctor removed the cast, treated the skin and put on a new cast. In mid-January, Ms. Wallace again went to Chestnut Hill Hospital after her arm began to emit an unusual odor. She did not receive any treatment on this occasion, however, because Dr. Horvath was unavailable and the doctor on duty told her that he could not treat Dr. Horvath's patients.

On January 22, 1974, Ms. Wallace visited her family physician in Maine. After examining the arm, he referred her to a specialist. The specialist found that the metal plate was floating free in her arm and that gangrene had developed; he hospitalized Ms. Wallace in early February, 1974, for extended treatment. After the hospital discharged Ms. Wallace on March 29, 1974, she learned that the specialist believed that Dr. Horvath had given her improper treatment.

Ms. Wallace filed a malpractice action against Dr. Horvath and the Chestnut Hill Hospital in Pennsylvania state court on March 24, 1976. The trial judge granted the defendants' motion for summary judgment on the ground that the two-year statute of limitations had expired. The plaintiff appealed the entry of judgment against her.

After determining that Ms. Wallace reasonably should have discovered her injury prior to March 24, 1974, the Superior Court affirmed. —— Pa.Super. at ——, 423 A.2d at 1050. In reaching its decision, the appellate court noted that Ms. Wallace had experienced pain and skin problems involving the broken arm throughout January of 1974 and that she had learned in early February of 1974 that the surgical plate was loose and that gangrene had developed. *Id.* By failing to mention during its analysis the specialist's opinion of Dr. Horvath's treatment and by holding that the limitations period began to

run before Ms. Wallace learned of that opinion, the Superior Court implicitly declined to attach any significance to the moment when Ms. Wallace reasonably should have realized that she had a cause of action against Dr. Horvath and the hospital. In a concurring opinion, Judge Brosky explicitly denied that the specialist's opinion had any significance, concluding that "it was not her knowledge that she had a cause of action, but rather her awareness that she had suffered an injury, that caused the statute of limitations to begin to run." —— Pa.Super. at ——, 423 A.2d 1050.

■ The discovery rule is a compromise that balances society's interest in giving a diligent plaintiff his day in court with society's interest in preventing prejudice to defendants and the waste of judicial resources through the litigation of stale claims. The courts of Pennsylvania could have tipped the balance strongly in favor of the diligent plaintiff by holding that the limitations period would not begin to run until the time when the plaintiff reasonably should know that he has a cause of action; but the courts have not so held. Instead, their decisions recognize a limitations period that begins to run when the plaintiff discovers his injury, the operative cause of that injury and the causative relationship between injury and the operative conduct.

Under prevailing Pennsylvania law, the two-year statute of limitations started to run in the present case when Mr. Bosworth learned that Stephanie had cerebral palsy, that the cerebral palsy resulted from oxygen deprivation during the first four minutes following delivery, and that several occurrences could have caused this oxygen deprivation. Although Mr. Bosworth had acquired all of this information within a year of Stephanie's birth, he did not initiate suit against Dr. Plummer and Latrobe Hospital until six years and seven months after her birth. We must hold that the plaintiffs' claims are time-barred.[2]

---

**2.** In light of our holding on the statute of limitations issue, we need not address Latrobe Hospital's contention that it is entitled to summary judgment because the plaintiffs have no expert

testimony establishing that the hospital was negligent so as to cause the alleged injuries and damages.